**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 29 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

HUNTSMAN CHEMICAL
CORPORATION, a Utah corporation,

Plaintiff-Counter-
Defendant-Appellee,

v.

HOLLAND PLASTICS COMPANY,
an Iowa corporation,

Defendant-Counter-
Claimant-Appellant,

and

J. D. SCHIMMELPHENNIG,

Defendant.

No. 98-4157
(D.C. No. 94-CV-473-B)
(D. Utah)

**ORDER AND JUDGMENT** *

Before **EBEL** , **KELLY** , and **BRISCOE** , Circuit Judges.

---

\*     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Appellant Holland Plastics Company [hereinafter "Holland"] appeals from an order granting summary judgment in favor of appellee Huntsman Chemical Corporation [hereinafter "Huntsman"] on Holland's counterclaim for price discrimination in violation of the Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13(a), and for treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse.

## I. Background Facts and Proceedings

We review the district court's grant of summary judgment de novo. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). In conducting that review,

> [w]e examine the record to determine whether any genuine issue of
> material fact was in dispute; if not, we determine [whether] the
> substantive law was applied correctly, and in so doing we examine
> the factual record and reasonable inferences therefrom in the light
> most favorable to the party opposing the motion.

*Id.* (quotation omitted). Viewing the evidence in this light, the record shows the following: Huntsman, a manufacturer of modified expanded polystyrene beads (hereinafter "beads") supplied Holland and one of Holland's primary competitors,

Iowa EPS, with beads at the same price until sometime in 1990. Both Holland and Iowa EPS produced foam board from the beads and sold the board to end users. The board price quoted to end users was directly related to and dependent upon bead price, and the greatest factor in competition was board price. In 1990, Huntsman began delivering beads to Iowa EPS at a significantly lower price through a wholesale agreement with a third party, Cellofoam North America. As a result, Iowa EPS passed on the savings by submitting lower board price bids to its customers and potential customers. While Holland had successfully competed against Iowa EPS before 1990 and had a similar market share of the business, Holland's revenues and sales decreased from 1990 until it declared bankruptcy in 1994. During this same time period, Iowa EPS increased its volume business and its market share. Holland produced testimony that, after 1990, it lost customers, potential customers, and market share because it could not meet the price at which Iowa EPS was able to sell the board to end users.

In 1994, Huntsman sued Holland for breach of an open account and Holland counterclaimed for price discrimination. Huntsman filed a motion for summary judgment in July 1997, alleging that Holland had not produced evidence sufficient to establish a prima facie case of violation of the Robinson-Patman Act; that it had failed to produce evidence of a causal connection between any alleged violation of the Act and its alleged damages; and that its theory of damages was

impermissible as a matter of law under *Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 394 (8th Cir. 1987).[1] *See* Appellant's App., Vol. I at 28. Holland responded with the above-described evidence showing price discrimination, causal connection, proof of losses, and an expert report that estimated actual damages. Huntsman's reply focused on the legal argument that, under *Rose Confections*, Holland could not prove what its damages were in a violation-free state of affairs by basing them on the assumption that Holland would have received the same discriminatory price as Iowa EPS, and that Holland's expert had improperly based his calculations solely on that assumption. *See* Appellant's App., Vol II at 511-16. In its surreply, which was not produced for this court, Holland apparently asserted that Iowa EPS was Holland's single competitor in Iowa, thus making *Rose Confections* inapplicable. *See id.* at 527,

---

[1] In this case, based on the fact that the Clayton Act is a remedial statute whose purpose "is to place the antitrust plaintiff as far as possible in the position it would have occupied but for the [antitrust] violation," the court held that "any calculation of section 4 damages must strive to approximate a violation-free state of affairs." 816 F.2d at 394. The court held that an expert's damage model whose calculations were based on what profits the disfavored purchaser would have made had it been given the same discriminatory benefit as the favored purchasers was therefore impermissible because if it had also been given the discriminatory price, other disfavored purchasers would have been discriminated against and the violation would continue. *See id.* at 394-95. The court noted that if the disfavored purchaser and the favored purchaser had been the only competitors in the market, it may have been proper to base damages on an assumption that the disfavored purchaser would receive the discriminatory benefit but for the antitrust violation. *See id.* at 394.

531.  It also apparently argued that the issue was controlled by *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034 (9th Cir. 1987), *aff'd*, 496 U.S. 543 (1990), in which the court permitted consideration of damages based on the disfavored purchaser receiving the discriminatory price.  *See* Appellant's App., Vol. II at 545.  The court denied the motion in February 1998, concluding that Holland had submitted enough evidence to survive summary judgment.  *See id.* at 522.

In March 1998, Huntsman moved for reconsideration of the court's decision.  It argued that the record did not support Holland's assertion that Iowa EPS was the single competitor and claimed that Holland had misstated facts concerning Holland and Iowa EPS's revenues and raw purchases.  Demonstrating that Holland had previously stated in its answers to interrogatories that it had other competitors besides Iowa EPS, Huntsman argued that, without support from depositions, interrogatories, admissions, or affidavits, Holland's "new" assertion that Iowa EPS was its sole competitor could not be considered by the court. *See id.* at 531.  Huntsman also argued that the court had erred in failing to grant summary judgment on its legal proposition that Holland's expert's report was based on an "irreparably flawed model of damages" and that Holland had failed to produce direct evidence of actual antitrust injury.  *Id.* at 533-34.

The court held a hearing on Huntsman's motion for reconsideration on May 12, 1998.  The court asked for another briefing on Holland's "case for

-5-

damages," and told the parties to "[a]ttach as exhibits anything else that you think that you need to." *Id.* at 539A. The court asked Holland specifically to demonstrate, if it could, a causal connection between damages and the price differential with anecdotal evidence, and to produce evidence to support its damage theory in regard to the expert report and/or to produce other evidence from which a jury could conclude that Holland suffered economic harm as a result of the price discrimination. *See id.* at 539A-B. On the same day, the court granted Huntsman's motion for an extension of time in which to file its expert report, which it had never submitted as required by Fed. R. Civ. P. 26(a)(2). *See id.* at 541.

On June 2, 1998, Holland filed a motion for additional time to file its supplemental brief, accompanied by a motion for leave to conduct additional discovery of Iowa EPS and Huntsman regarding damage issues and a motion to submit a supplemental expert report that would calculate damages without consideration of the reduction in price component forbidden in *Rose Confections*. *See id.* at 544-46. Holland noted that Huntsman would suffer no prejudice because it had not yet deposed Holland's expert and still had not submitted its expert's report, and trial had not been set. Huntsman objected to additional discovery and supplementation of the expert's report, arguing that it would incur additional expert expense to rebut any new theories of recovery, that Holland had

failed to comply with Fed. R. Civ. P. 56(f), and that it would be prejudiced by further delay. *See id.* at 554-55.

On June 22, 1998, the district court granted Holland additional time in which to file its brief but denied leave to conduct additional discovery or to supplement its expert's report with the new calculations because it had failed to comply with Rule 56(f) and because it would unjustifiably delay the case. *See id.* Vol. III at 562. On July 2, 1998, Holland filed supplemental answers to interrogatories and a document entitled "Clarification of Facts in Resistance to Motion for Summary Judgment" which included a "clarification affidavit" of Holland's expert, the supplemental answers to Huntsman's second set of interrogatories, and answers to Huntsman's third set of interrogatories. *See id.* at 571-84. Huntsman moved to strike the clarification of facts and supplemental answers to interrogatories, arguing that they were submitted in violation of the court's discovery ruling and its order that Holland could not submit a supplemental expert report. *See id.* at 622. Holland argued that the documents were not additional discovery, that its expert's clarification was not a supplemental report espousing a different theory, and that the supplemental interrogatories were not inconsistent with the previous record. *See id.* at 629.

After a hearing, the court granted the motion to strike and the motion for summary judgment. At the hearing, the court ruled that the clarification of facts

and supplemental answers were contrary to his prior order and would not be considered. *See id.* at 814. The court did not rule on the adequacy of the evidence with respect to the fact of damages because that was "a closer question" and it was "not sure there is not a valid underlying case," but that the case was being "thrown out" because of "the way it has been presented in litigation." *Id.* at 815. The court also did not comment on Holland's argument that, even if the expert report could not be used, there was sufficient testimony in the record to raise a genuine issue of material fact regarding the amount of damages arising from price discrimination. *See id.* at 811-16.

## II. Discussion

Holland raises three issues for appeal: (1) the district court erred in striking and refusing to consider for summary judgment purposes its clarification of facts and supplemental answers to interrogatories; (2) its expert's damage model was not improper as a matter of law; and (3) apart from the expert report, enough evidence regarding damages had been submitted to survive summary judgment.

**A. Court's refusal to consider supplemental summary judgment evidence.** Holland does not contest the court's denial of its motion to conduct further discovery or submit a supplemental expert report under Rule 56(f); rather it contends that the court erred in striking its supplemental affidavits and sworn

answers that were submitted without the need for additional discovery. Thus, although the parties couch the court's refusal to consider the supplemental evidence as one involving "discovery issues" in which the standard of review is abuse of discretion, *see Jensen v. Redevelopment Agency*, 998 F.2d 1550, 1553 (10th Cir. 1993) (affirming denial of Rule 56(f) motion for additional discovery), in resolving the legal issue whether a court has given the non-moving party a sufficient opportunity under Rule 56 to rebut a motion for summary judgment *absent* additional discovery, we review the submitted summary judgment evidence de novo. *See McKnight,* 149 F.3d at 1128 (stating that reviewing court conducts de novo review of record to determine whether a genuine issue of material fact is in dispute); *see, e.g., Adams v. Campbell County Sch. Dist.*, 483 F.2d 1351, 1353-54 (10th Cir. 1973) (reversing summary judgment because court "deprived [non-moving party] of an adequate opportunity to be heard and denied them the right to present controverting material" and noting, in concurring opinion, that a non-moving party has the right on summary judgment to explain the record asserted by moving party or to deny its effect by counter-affidavit); *Peck v. Horrocks Eng'rs, Inc.*, 106 F.3d 949, 955 (10th Cir. 1997) (conducting de novo review of the affidavit, stating that party has right to submit affidavits only when that affidavit "set[s] forth specific facts showing that there is a genuine issue for trial" under Rule 56(e), and holding court did not abuse discretion in refusing to

consider affidavit that did not meet that standard (quotation omitted)); *United States v. Mills*, 372 F.2d 693, 697 (10th Cir. 1966) (independently reviewing affidavit submitted by nonmoving party and determining that court erred in refusing to consider it).

We begin by noting that Huntsman did not present evidence that Iowa EPS was not Holland's primary competitor. Rather, one of its key arguments in its motion for reconsideration was its allegation that there was an *absence* of record evidence that Iowa EPS was Holland's primary competitor and that Holland's first interrogatory answers stated that it had many competitors. As stated above, the court invited Holland to attach to its supplemental brief whatever controverting exhibits it needed to support its objections to the motion for reconsideration.

A review of Holland's expert's "clarification affidavit" shows that he explained that his damages model was based on the presumption made in his May 1997 addendum that Holland's primary market was within 100 to 150 miles of Gilman, Iowa; that Iowa EPS was Holland's only other major competitor in that area; and that was why he excluded from the damages model competitors that were outside that area. *See* Appellant's App., Vol. III at 573. Contrary to Huntsman's assertions, the expert's original presumptions were not "new" allegations made after the close of the discovery period and his "clarification affidavit" explanation of them did not contradict his earlier report. *Cf. id.* Vol. I

-10-

at 130-31 (May 12, 1997 addendum to expert report noting that Holland and Iowa EPS were the two primary producers in the Iowa market and explaining why the costs were lower for producers within 100 miles of their plants). The "clarification affidavit" also did not espouse a new theory of damages that had been prohibited by the court in its order denying supplementation of the expert's report. In the tendered affidavit, by referring to his previously-submitted reports, Holland's expert also rebutted arguments made in Huntsman's motion for reconsideration regarding alleged misstatements of revenues and market share. *See id.* Vol. III at 573-74. The tendered affidavit therefore set forth facts showing genuine issues for trial.

Likewise, in its supplemental answers to interrogatories Holland did not seek to contradict its first answers to interrogatories, but rather sought to "square" those answers with its assertions that Iowa EPS was Holland's only competitor in its *primary* market area. The supplemental answers demonstrated to the court the physical location of the other competitors listed in the original answers in relation to Holland and Iowa EPS by referring to its expert's geographical market graph that had been submitted during the discovery period. *See id.* at 577-81. Holland could have submitted the same testimony through simply presenting an affidavit instead of "supplemental answers." The court abused its discretion in refusing to consider Holland's controverting affidavits and sworn supplemental answers and

thereby denying it an opportunity to rebut Huntsman's summary judgment motion. *Cf. Adams* , 483 F.2d at 1353-54.

**B. The expert's damage model.** Holland's expert calculated Holland's lost profits on a damages model that assumed that, absent a price discrimination violation, Holland would have received the same bead price as Iowa EPS. The district court determined that the Supreme Court in *J. Truett Payne Co. v. Chrysler Motors Corp.* , 451 U.S. 557 (1981), prohibited use of a discriminatory price as a basis to determine damages in price discrimination cases. *See* Appellant's App., Vol. III at 796, 806. The court also believed that allowing the disfavored buyer to assume, for purposes of calculating damages, that it would have received the discriminatory price absent the violation did not "approximate a violation free environment" under *Rose Confections* and concluded that Holland's expert's damage model was "inappropriate." *Id.* at 814. Holland argues that *J. Truett Payne Co.* does not prohibit use of the discriminatory price as an aid in calculating damages, and we agree.

In *J. Truett Payne Co.* a car dealership alleged that the manufacturer's refusal to offer it the same incentives as other dealers caused it to pay more for its cars than other dealers had to, thus violating the Robinson-Patman Act. It contended that, at a minimum, damages should be measured by the amount of the price difference multiplied by the number of car purchases. *See* 451 U.S.

-12-

at 559-60. The Fifth Circuit disagreed with the dealer's theory that minimum "automatic damages" flow from the fact of price discrimination and reversed the jury award, finding that the dealer had failed to introduce substantial evidence of injury attributable to the incentive programs as well as evidence of the amount of any losses suffered because of such injury. *See id.* at 560-61.

The Supreme Court held that proof of Robinson-Patman price discrimination does not automatically entitle a plaintiff to damages under § 4 of the Clayton Act because a violation of Robinson-Patman may be proved without the disfavored purchaser having actually been injured. *See id.* at 562. In determining whether the plaintiff had presented enough evidence to survive a motion for directed verdict on liability, the court noted that the plaintiff had failed to show whether its competitors actually passed on their lower costs to their customers. *See id.* at 564. The plaintiff had only testified generally that price discrimination was one of the causes of the dealership going out of business because it lost sales to competitors; that the discrimination caused him to "force" business by giving more for trade-ins; and that his average gross profit on used car sales was below his competitors' (though the same evidence revealed that his average profit on new sales was higher). *See id.* at 563-64. Significantly, plaintiff's expert testified regarding what the competitive market may have been like if plaintiff had received the same discriminatory bonuses from the

manufacturer. *See id.* at 564. The Court did not question whether this testimony was a permissible assumption. Rather, the Court stated that the expert's evidence of injury was weak because of the plaintiff's failure to show that the favored retailers in fact lowered their retail prices because they received the incentives. *See id.* at 564 & n.4, 565. The Court remanded to the Fifth Circuit to determine whether the evidence supported a causal inference of actual antitrust injury arising from the incentive programs. *See id.* at 568. If sufficient evidence existed to permit such an inference, then the "relaxed damages rules" would apply to permit an award of damages under the "just and reasonable inference"of damage standard. *See id.* at 566-67. Nowhere in the opinion did the Court imply that it is improper for an expert to use in a damages model a comparison of the profits the disfavored plaintiff would have made had it received the same discriminatory price as his favored competitors. The Court simply held that evidence of the amount of price discrimination, *standing alone*, is not sufficient to prove damages actually suffered from an antitrust injury.

Holland argues that *Hasbrouck v. Texaco, Inc.* buttresses its position that its expert could properly base lost profits on what the disfavored purchaser would have made if it had received the discriminatory price. In this case, twelve service station owners successfully sued their supplier, Texaco, for selling gasoline to their competitors for between 2.5 and 5.75 cents/gallon lower than they paid.

*See* 842 F.2d at 1037. On the issue of damages, Texaco made similar arguments as Huntsman does in this case: that the plaintiff failed to prove actual injury that the antitrust laws were designed to prevent; that there was no direct causal connection between any such injury and Texaco's conduct because of the independent, intervening pricing decisions of plaintiff's favored competitors; and that the district court improperly allowed the jury to consider the overcharge to the disfavored purchasers in its calculation of damages. *See id.* at 1042-43. The Ninth Circuit stated that, to prove actual injury, the plaintiff had to show that he lost sales and profits as a result of Texaco's discriminatory conduct. *See id.* at 1042. The plaintiff had testified as to diverted sales and lost profits, presented evidence of the favored buyer's increase in sales volume over the specific time period, and "testified that they would have recouped the lost revenues had they received a [similar] price break on their purchases of gasoline from Texaco." *Id*. at 1043. Former customers testified that they switched service stations because of lower prices. *Id.* The Ninth Circuit held that this testimony was sufficient to support a finding of both actual antitrust injury and causation. *See id.*

The expert in *Hasbrouck* , like Holland's expert, presented a market analysis that compared the plaintiff's actual prices, volume, and profits to estimated amounts had the price discrimination not occurred. In some analyses, the expert

assumed that Texaco had raised its prices to the favored buyers; in others, the expert assumed that Texaco lowered its prices to the disfavored buyers. *See id.* Answering Texaco's claim that evidence of the overcharge was not a permissible consideration for the amount of damages, the Ninth Circuit stated that the

> various projections simply permitted the jury to compare estimates of damages in different market situations, allowing them to determine what [the plaintiff's] sales and profits would have been in the absence of price discrimination. Obviously, such a determination necessarily entails postulating the elimination of the price differential, either by increasing the favored buyer's price, decreasing the disfavored buyer's price, or a combination of the two.

*Id.* at 1043-44. The court stated that any danger that the jury may have awarded "automatic damages" based on the overcharge theory was offset by the district court's oral admonition and the jury instructions. *Id.* at 1044.

On appeal to the United States Supreme Court, although Texaco's petition for certiorari couched the issue as whether a retailer could "predicate injury and recover treble damages on the basis of how much better off he would have been had he, too, received the wholesaler discount," *see* Robert H. Whaley & Keith B. Leffler, *Private Actions & Proof of Damages in Secondary Line Cases--the Texaco Inc. v. Hasbrouck Experience*, 59 Antitrust L.J. 811, 819 n.34 (1991), the Court addressed only Texaco's contention that legitimate functional discounts do not violate the Clayton Act because a seller is not responsible for its customer's independent resale pricing decisions. *See* 496 U.S. at 547. It left the Ninth

Circuit's discussion regarding proper damage models intact. In its discussion, however, the Court noted that the damages expert had estimated what the plaintiffs' profits would have been if they had paid the same prices as their favored competitors and that the jury had based its award on this testimony. *See id.* at 552. The Court later stated that this testimony provided a "sufficient basis for an acceptable estimate of the amount of damages." *Id.* at 572. Under *Hasbrouck*, therefore, the district court in this case improperly prohibited the use of Holland's expert's report.

In the case before us, Holland presented evidence that it and Iowa EPS were the primary competitors in the Iowa geographic area and that Huntsman had directly delivered beads to Iowa EPS in amounts similar to those delivered to Holland for the discriminatory price over a long period of time. Holland argues that it was reasonable for its expert to assume that Holland would have received the discounted price absent Huntsman's price discrimination because the discriminatory price was obviously an economically viable one for Huntsman. Thus, there was arguably no danger that basing a calculation of lost profits on the lower price given to Iowa EPS would perpetuate an illegal discriminatory pricing scheme as proscribed by *Rose Confections*, 816 F.2d at 394. Whether the price given to Iowa EPS was an economically viable one that Holland could have expected to receive absent the price discrimination is a jury question. While

Holland's expert report is certainly subject to criticism in certain areas, those matters are for cross-examination at trial and we cannot say as a matter of law that the theory espoused therein does not have a basis in fact that could sustain a jury award.

**C. Sufficient evidence to support alternative theory**. Holland argues that the court further erred by granting summary judgment when it had presented sufficient evidence from other witnesses besides its expert to support an award of damages. *See, e.g., J. Truett Payne Co.*, 451 U.S. at 564 n.4 (stating that "if by reason of the discrimination, the preferred producers have been able to divert business that would otherwise have gone to the disfavored shipper, damage has resulted to the extent of the diverted profits. If the effect of the discrimination has been to force the shipper to sell at a lowered price . . . damage has resulted to the extent of the reduction." (quotation omitted)). Huntsman argues that Holland failed to specifically identify lost sales attributable to the price discrimination and that the testimony presented was insufficient to support an award of damages. This is not an appeal from denial of a motion for directed verdict after a full trial on the merits, however. In a summary judgment motion, a sufficiency inquiry asks only whether there was enough evidence to establish a genuine issue of material fact regarding the issue.

It is well established that a "relaxed" damage rule applies once a plaintiff establishes anticompetitive injury from a Robinson-Patman Act violation. *See Hasbrouck*, 496 U.S. at 572-73. Antitrust damages are rarely susceptible of concrete, detailed proof and once antitrust injury is shown, antitrust plaintiffs should not face unduly rigorous standards for proving damages. *See id.* The rule is based on the well-established tenet that "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne Co.*, 451 U.S. at 566-67. Huntsman conceded Robinson-Patman liability for purposes of the summary judgment motion.

Holland presented testimony that it had previously been competitive with Iowa EPS until Iowa EPS received lower prices in 1990 that allowed it to underbid Holland and forced Holland to sustain losses in order to keep customers. *See* Appellant's App., Vol. I at 126, 130-32, 219-20, 232-33, 254; Vol. II at 439-40. It presented testimony from an end user that it bought Iowa EPS board instead of board manufactured by Holland solely because the Iowa EPS board was cheaper, *see id.* Vol. II at 282, and that it would usually buy the cheaper product in most instances, *see id.* at 321. It also presented testimony that the lower the bead cost, the greater the profitability, *see id.*; Appellant's Supp. App. at 610, and that if Iowa EPS had paid even one or two cents more per pound, it

-19-

would have made a difference in whether it had profits or losses on its bids. *See* Appellant's App., Vol. II at 346; Appellant's Supp. App. at 604. It produced net income figures showing actual amount of losses during the period from 1990-94. *See* Appellant's App., Vol. I at 124. The jury could infer from this evidence that Holland's market share would have remained the same absent illegal price discrimination and that, absent the illegal discrimination, Holland could have made a profit on bids to customers such that its yearly net losses would not have increased to over $250,000 in a period of four years. We hold that Holland satisfied its burden of showing genuine issues of material fact in regard to the existence and amount of damages.

The judgment of the United States District Court for the District of Utah is REVERSED, and we REMAND for further proceedings consistent with this order and judgment.

Entered for the Court

David M. Ebel
Circuit Judge